```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO. 15-CR-20339-DPG
3

4    UNITED STATES OF AMERICA,          Miami, Florida

5              Plaintiff,               August 3, 2016

6    vs.                                11:00 a.m. to 12:26 p.m.

7    MATTHEW PISONI, MARCUS PRADEL,     Pages 1 to 55
     VICTOR RAMIREZ.
8

              Defendant.
9    _____

10                        MOTION HEARING
                 BEFORE THE HONORABLE DARRIN P. GAYLES
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:      H. RON DAVIDSON, ESQ.,
                              ELIJAH LEVITT, ESQ., and
14                            ANTHONY ERICKSON-POGORZELSKI, ESQ.
                              ASSISTANT UNITED STATES ATTORNEYS
15                            99 Northeast Fourth Street
                              Miami, Florida 33132
16

17   FOR MATTHEW PISONI:      J. DAVID BOGENSCHUTZ, ESQ.
                              BOGENSCHUTZ & DUTKO
18                            600 S. Andrews Avenue
                              Suite 500
19                            Fort Lauderdale, Florida 33301

20
     FOR MARCUS PRADEL:       MARC NURIK, ESQ.
21                            LAW OFFICES OF MARC S. NURIK
                              1 E. Broward Boulevard
22                            Suite 700
                              Fort Lauderdale, Florida 33301
23
     FOR VICTOR RAMIREZ:      ANNA LANIADO, ESQ.
24                            SINCLAIR LOUIS & ZAVERTNIK, P.A.
                              40 N.W. 3rd Street, Suite 200
25                            Miami, Florida 33128
```

1    STENOGRAPHICALLY REPORTED BY:

2                         PATRICIA DIAZ, FCRR, RPR, FPR
                          Official Court Reporter
3                         United States District Court
                          400 North Miami Avenue
4                         11th Floor
                          Miami, Florida 33128
5                         (305) 523-5178

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Call to the order of the Court.)

 2            THE COURT:  Please be seated.

 3            COURTROOM DEPUTY:  Calling United States versus Matthew

 4     Pisoni, et al., case number 15-CR-20339.  Counsel, please make

 5     your appearance.

 6            MR. DAVIDSON:  Good morning, Your Honor.  Ron Davidson

 7     appearing on behalf of the United States.

 8            With me is Anthony Erickson-Pogorzelski.  Forgive me if

 9     I mispronounced that.  He is with our civil division.  I had

10     him serve a subpoena so he is present in case that becomes an

11     issue.

12            Also with me from the criminal side is Elijah Levitt,

13     Assistant United States Attorney.

14            THE COURT:  Okay.  Good morning.

15            MR. BOGENSCHUTZ:  Good morning.  May it please the

16     Court, Your Honor, my name is Dave Bogenschutz.  I represent

17     Matthew Pisoni.  Together with me at the table is

18     Ms. Jacqueline Broudy, a legal intern with my office, and

19     Mr. Pisoni is to my right.

20            THE COURT:  Okay.

21            MR. NURIK:  Good morning, Your Honor.  Marc Nurik

22     appearing on behalf of Marcus Pradel, who is seated right next

23     to me.

24            THE COURT:  Okay.

25            MS. LANIADO:  Good morning, Your Honor.  Anna Laniado
```

1   representing Victor Ramirez.  By my side is also Kathleen

2   Rodriguez, who is an intern with us this summer, Your Honor.

3           THE COURT:  Okay.  Good morning.

4           Okay.  We are here for a couple of motions.  There, of

5   course, is a motion to dismiss indictment as well as the motion

6   to quash subpoenas, which is from the Government which is

7   mentioned earlier.  It's a motion in limine, the unopposed

8   motion to continue, which I believe we granted yesterday,

9   although we have to discuss some dates, and the defendants'

10  joint motion for production of all rough notes, which I think

11  maybe that would be the best place to start.

12          I didn't want to -- I know the parties wanted a ruling

13  on that before today's hearing but I wanted to hear some

14  argument on that.  So why don't we start with that and to the

15  extent that we need to reset the hearing based on my ruling on

16  that then I will do that.

17          Who wants to speak first?

18          MR. BOGENSCHUTZ:  If it please Your Honor, I will go

19  first.  I think that Mr. Nurik probably wants to address this

20  and perhaps Ms. Laniado would like to address it as well.

21          I have had the benefit of reviewing the Government's

22  response to this as well as filing a reply to it on our behalf

23  and I think it boils down, frankly, to the difference between

24  what the Government is suggesting Rule 16 and the case law

25  supporting Rule 16 disclosures provides and either restricts or

1    rejects and the real purpose of the filing of this motion.

2         The motion was filed, primarily, as adjunct to our

3    motion to dismiss.  It was filed in order that the defendants

4    and each of them have the opportunity to look at what Mr. Leon,

5    who was a cooperating witness for the Government, has been

6    telling the agents that didn't make it into the MOIs.

7         Now, we know that the agents, at least in the first two

8    MOIs, when they provided that document to us, it was done at a

9    time that was distant from the time that they actually did the

10   interviews.

11        The first MOI -- MOI meaning Memorandum of Interview.

12   The first MOI from February 17th, 2016, was a couple of weeks

13   or so after -- that was prepared a couple of weeks or so after

14   the actual interview took place, and they even suggest that.

15   And then there is another one from 3/11/16 that took place a

16   month or so before the actual presentation of the evidence that

17   made it into the MOI itself.  So they were kind of delayed

18   MOIs.

19        Two other MOIs came in at a later time, I think

20   July 5th and July the 12th, that dealt with other issues that I

21   don't know that we are really going to get to today.  But the

22   first two are kind of important.  The reason they are important

23   is because I think the evidence is going to show that on

24   February 12th -- well, let me withdraw that.

25        I think the evidence will show that the Government

1   began to talk to John Leon somewhere on or before January 20th

2   of 2016, at a time when it's the defense contention that he was

3   still cooperating under the terms of an oral joint defense

4   agreement that was actually continuing from the time in

5   November of 2014 when a written joint defense agreement took

6   place before the indictment ever occurred.  When the

7   January 20th date came and however it occurred -- whether

8   Mr. Leon and his attorney contacted the Government or whether

9   the Government contacted them is really not important at this

10   time.  What is important is that the Government concedes that

11   that's when they first began having these discussions.

12       Subsequent to that, there were other meetings between

13   defense attorneys with clients, some without the clients, some

14   the clients themselves, which was encouraged by the lawyers

15   because this is a fairly complicated case and the defendants,

16   themselves, had much greater knowledge of the corporate

17   structures of these companies and who actually was the owner of

18   a company and which individuals they used for printing.

19       I don't know how much the Court knows about the

20   underside of this case and what it's really involved in but

21   it's a case where the Government is alleging that the

22   defendants and all of them together participated in a scheme or

23   artifice to defraud where they had provided and prepared

24   mailings that suggested to people that they had won -- it's the

25   Government's version -- that they had won X amount of dollars

1   in order to have them send sometimes small, sometimes larger

2   amounts of money for their participation in winning that

3   lottery, that amount of money.  Then it contends something

4   substantially different but nevertheless -- so a whole lot of

5   corporations were involved in this, and there were other

6   individuals involved that were not indicted here.

7          All of this is going on, the defendants are indicted in

8   May of 2015.  As far back as November -- and this may be a

9   little lengthy to try to explain this to the Court, but back in

10  November of 2014 a first meeting was held where they all had

11  lawyers provided to them to talk to them about a joint defense

12  agreement to try to prepare for what they thought was an

13  insipid or an immediate indictment.  That didn't come down for

14  several months later.

15         So January 20th becomes important.  As I said, the

16  Government has conceded that January 20th is the day, on or

17  about that day is the day they first talk to this one

18  particular defendant, Mr. Leon, who then became, as of

19  February 27th, about a month later -- 17th, thank you.

20         If I say 27th again, Judge, 27th is stuck in my mind.

21  It's really February 17th, where they met with Mr. Guerra and

22  the defendant, them meaning the Government, and signed a

23  potential plea agreement and a factual proffer of some type

24  based on what we collectively call a plea for a day later.

25  That happens on February 17th.

1              February 12th, Mr. Leon is still moving towards being a

2    cooperator since January 20th, asks for documents to be sent in

3    by a codefendant, which the codefendant does, Mr. Pradel.

4    Those documents include his timeline, includes things that were

5    sealed in this record by the Court order.

6              Subsequently, no information is given to the

7    defendants, nor was it given to Mr. Leon as to what he was

8    permitted to do while he became a cooperator -- we don't take

9    issue with this -- except, the Government has conceded that

10   they told him that it was okay for him to go to joint meetings

11   even though everything in the world was discussed about

12   information, strategies, the advice of counsel defense, things

13   that the lawyers and the defendants believed were still under

14   the joint defense agreement but that the Government told him

15   don't become directly involved in it, don't start asking

16   questions, don't ask for any documents, don't do anything like

17   that because -- I don't want to speak too much for the

18   Government but because according to the Government, he was

19   cooperating in a different and an unrelated investigation and

20   they were concerned that that may "blow his cover".

21             Nevertheless, he attended.  And he attended from the

22   17th -- actually from the 20th, all the way through April

23   the 20th, 2016.

24             Now, the reason that April 20th, 2016, is important is

25   that on April 20th, 2016, Mr. Nurik, who represents Mr. Pradel,

1    noticed that a superseding information had been filed and up to

2    that time we had no idea he was cooperating.  Nobody had any

3    idea except, obviously, Mr. Leon, his lawyer, and the

4    Government -- had been filed where Mr. Leon had been charged

5    with 371 conspiracy, even though his original indictment

6    contained substantial other number of charges and counts.

7         In discussing this matter with Mr. Davidson, when we

8    saw that, Mr. Davidson advised candidly that, yes, he has -- he

9    was at that time a cooperating individual and he had been so

10   since February 17th.  And he basically told us on the telephone

11   what I just told the Court as far as what they had advised him

12   and what they had advised him not to do.

13        All during that time we have information that he has

14   been given or that he has been giving to the Government in view

15   of his cooperation, some of which we later learned when

16   Mr. Davidson provided it to us, we later learned occurred on

17   the actual date, February 17th, in a lengthy MOI, which we

18   have.  That's the one I discussed before the Court and said

19   that the agents had prepared that somewhat distant from the

20   time that it was actually done but from their notes.

21        Secondly, March 11th, a second MOI got to us, not on

22   March 11th but the March 11th MOI was the day of the interview

23   and we received that, I think, in probably May.  In May.  At

24   our request Mr. Davidson duly had the agents prepare it and it

25   was sent out.

```
 1              Our contention is that based on what we have seen in
 2    those two MOIs, that information was imparted to the Government
 3    in those MOIs that came directly from documents given to him,
 4    something he was not supposed to be doing, and that's
 5    requesting actual documents because there was a second
 6    information -- from anything.  He was supposed to just sit
 7    there I guess like a bump on a log, blind, deaf and unable to
 8    see, hear or understand so that the Government had some type of
 9    cover that he wouldn't be blowing by failing to attend these
10    meetings, whether telephonically or personally.
11              THE COURT:  I just want to be clear.  So what you are
12    saying is after or between February 17th and April of 2016 that
13    Mr. Leon continued to attend these meetings?
14              MR. BOGENSCHUTZ:  He did.
15              THE COURT:  How many meetings are we talking about?
16              MR. BOGENSCHUTZ:  Well, with the codefendants and
17    jointly with the lawyers I would think an excess of six.  At
18    two of those meetings -- actually, at one of the meetings he
19    received a list of witnesses sent by a private investigator to
20    him, and we have actual chats between himself and other
21    codefendants from that date, April the 14th, where he is asking
22    where are the witnesses.  This is two months after he has
23    become a witness for the Government and then concedes, "I found
24    them.  They are in my Spam."
25              That's a list of about, I am going to guess -- we have
```

1   a list but it's probably about 40 to 50 witnesses, but not just

2   witnesses.  He got the witness list during a joint meeting that

3   they had with the codefendants and the private investigator who

4   is expected to testify here, and on the witness list there

5   are -- it's an itemization of things that they had done and who

6   they worked with.

7          The whole purpose of that meeting was to try to figure

8   out who we needed to, who we needed to take statements of, who

9   we needed to investigate to see whether they were cooperating,

10  whether they weren't cooperating, if they would cooperate with

11  us, and that list was a list that was a list in progress for

12  probably several months.

13         Each individual has a -- their initials are on the left

14  of some of the witnesses saying they are responsible for trying

15  to get these witnesses and talk to them and find out what

16  position they were in.

17         That's April 14th, six days before we find out that

18  Mr. Leon has actually agreed to and had an information filed

19  against him.

20         So our contention is this, Judge, on this particular

21  motion.  This isn't your routine Rule 16 request, which is what

22  the Government has given you cases on.  This is a request that

23  says we need to know what else he has told the Government that

24  these agents in their haste to put together an MOI -- and I'm

25  not saying they were telling an untruth or anything but in

1    their haste to put in the MOI and to put in the MOI what they

2    thought was important, what else did he tell them?  What else

3    did he suggest to them that he knew?

4        And we are going to show, I think, during this hearing

5    that there were times and places where Mr. -- where the MOI

6    itself is a direct -- it's a little frightening, to be honest

7    with you -- is a direct reflection of a document sent to him by

8    Mr. Pradel on the 12th of February.

9        I mean, even down -- even to the point where you can

10   see if you put them side by side the chronology is exactly the

11   same.

12       Notwithstanding that, we also need to know -- and I

13   think part of my motion was, just tell us whatever other

14   interviews he has given to the Government that you may not want

15   to put in an MOI or you don't think is important now but may be

16   important later, let us look at that and just see if, in fact,

17   this is an obvious reference to something he learned during a

18   joint defense agreement or during the times where he was

19   present at meetings either joint with lawyers or jointly with

20   his codefendants.

21       THE COURT:  Excuse me, regarding those meetings, the

22   meetings with the other defendants and with counsel, during

23   those meetings did Mr. Leon, as you put it, sit as a bump in a

24   log or did he affirmatively request information?

25       MR. BOGENSCHUTZ:  He affirmatively requested

1   information in several of them.  We have the documents that

2   show it.

3          THE COURT:  I'm sorry, when you say he had documents to

4   show, to show he affirmatively asked for information?

5          MR. BOGENSCHUTZ:  Asked for it and received it,

6   documents, not just information, chats, clearly violating the

7   directions that the Government had indicated that they had

8   given him.

9          Now, I think it's important to suggest -- and the Court

10  made this comment that maybe this is the first thing we ought

11  to do, respectfully.

12         We did, in fact, subpoena Mr. Davidson.  Through the

13  course of discussion yesterday and the day before and I think

14  in an effort that the Government made as well as we did to kind

15  of smooth that issue out and make sure we would proceed with

16  some semblance of fluidity here, we have reached an agreement

17  as to a stipulation of facts that if Mr. Davidson had

18  testified, he would have said X, Y and Z, and we have it

19  reduced to writing.  It just got reduced to writing yesterday.

20         Counsel has not filed it yet but that was only because

21  of the time issue.  But we have it with us today, so the motion

22  to quash -- one of the things we ask is that the motion to

23  quash either be withdrawn or to strike it.  So that issue we

24  can take off the table with leave of Court and deal with that

25  stipulation.

1        As I said, we have already reduced it to writing and we

2   are all in agreement that that's, in fact, sufficient for the

3   subpoena.

4        THE COURT:  You are fine with that, Mr. Davidson?

5        MR. DAVIDSON:  Yes, Your Honor.

6        If I can respond to the issue of motion for rough

7   notes.

8        THE COURT:  Well, I want to make sure that everyone has

9   spoken on that that wants to speak.

10       MR. BOGENSCHUTZ:  I have finished that presentation.

11       THE COURT:  Okay.

12       MR. NURIK:  Your Honor, very briefly --

13       THE COURT:  I'm sorry, for the court reporter's

14   benefit, state your name.

15       MR. NURIK:  I'm sorry, this is Marc Nurik on behalf of

16   Marcus Pradel.

17       Your Honor, I would proffer that at a hearing the

18   evidence would show that as Mr. Bogenschutz stated, beginning

19   on January 20th -- to give you context, beginning on

20   January 20th, Mr. Leon's counsel began negotiating a possible

21   plea in cooperation with the Government, which was ultimately

22   finalized on the 17th of February.

23       The evidence would show that on the 20th of January,

24   that same day, Mr. Leon requests a chart, organizational chart

25   and timeline that Mr. Pradel was preparing for me and for the

 1    joint defense group.  And, ultimately, Mr. Pradel produced that

 2    on the 12th of February to Mr. Leon.  And it would be our

 3    contention that information in that made its way into the

 4    interviews and information that was given to the Government.

 5           Now, we have at least four memorandum of interviews

 6    that the Government has provided us.  However, they have

 7    provided us those interviews after we made an issue of this.

 8    Now, it is our position that since the Government has, in their

 9    response, claimed that no information was given by Mr. Leon to

10    the Government that came from the other defendants during any

11    meetings or agreements, we believe it's absolutely critical to

12    examine every writing there is, any evidence there is of any

13    information that Mr. Leon gave to the Government and, of

14    course, clearly the rough notes that are made at the time

15    contemporaneous with the discussions would probably be even

16    more important than the reports that were made at a later day.

17           And while I am not at this point attributing any of

18    those reports to having been intentionally sanitized or

19    fabricated, I can't completely rule that out, whether

20    intentionally or not, because they were delivered to us after

21    we made an issue of this.  So we believe looking at those rough

22    notes becomes absolutely critical.

23           THE COURT:  All right.  On behalf of Mr. Ramirez,

24    anything you want to add?

25           MS. LANIADO:  We have nothing to add, Your Honor.  We

1    join in the motion to compel those rough notes.

2            THE COURT:  All right.

3            Mr. Davidson.

4            MR. DAVIDSON:  Thank you, Your Honor.

5            We agree that the issue regarding rough notes is

6    related to the motion to dismiss.  That's pretty much all we

7    agree upon.

8            The rough notes, the first debriefing was on

9    February 17th, 2016, and the agents memorialized that in a

10   15-page mostly single-spaced memorandum.

11           The March 11th, 2016, interview was memorialized in a

12   seven-page single-spaced memorandum.  Those are the at Docket

13   Entry 162, Exhibit 4 and Docket Entry 162, Exhibit 8.

14           Now, the rules of the Eleventh Circuit consist --

15   specifically, the Jordan opinion says that rough notes are not

16   normally discoverable, and that makes sense because the report

17   memorializes what happens.

18           In this particular case, that is what happened.  The

19   agents met with Mr. Leon and they put down what he said as

20   demonstrated in the report.

21           Now, defense counsel has suggested that maybe there is

22   something else that's out there that is not in the reports, and

23   I think the problem with the argument is the timing.  If we

24   look at the timing of what they are concerned about,

25   Mr. Bogenschutz spoke about an April 14th meeting.  He spoke

 1    about other meetings.  I think he said six meetings with

 2    defense counsel.

 3          The problem is, Mr. Leon was debriefed on February 17th

 4    and March 11th.  It is physically impossible for him to have

 5    disclosed to the Government in February or March things that

 6    happened in April.  So the idea that somehow the joint meetings

 7    with the attorneys that happened in April or afterwards somehow

 8    were disclosed by Leon in February or March have to be put

 9    aside.  That is impossible as a chronology of events.

10          What they seem to be saying instead is that Mr. Leon,

11    when he came in to meet with us, did not actually have

12    independent knowledge of what happened but instead came up with

13    the information through information that Pradel or Pisoni or

14    Ramirez gave them in other conversations.  But that's really a

15    problem, Your Honor, because the date at which Mr. Leon became

16    a Government informant and a Government agent was

17    February 17th, 2016.  That is the date that is significant.

18    Anything that Leon learned before is not at the Government's

19    doing.  We never had the ability to tell Leon anything until he

20    came in and signed his plea agreement.

21          The mere possibility of discussions back in January or

22    February about maybe he would plead, maybe he would cooperate,

23    I could not instruct Mr. Leon.  The agents could not instruct

24    Mr. Leon of anything until he came in and signed the plea

25    agreement.  And it wasn't exactly a hundred percent sure

1    whether Leon would sign that plea agreement or even that the

2    plea offer would be extended until right around February 17th

3    and when he actually signed that agreement.

4              THE COURT:  But wouldn't Mr. Leon have an incentive to

5    violate that agreement?

6              If the Government had a discussion with him on

7    January 20th about a possible plea agreement between -- you

8    know, after January 20th, I mean, it would seem that Mr. Leon

9    would then try to get as much information as he could from the

10   codefendants to show that there was some value that he could

11   provide substantial assistance.

12             MR. DAVIDSON:  Correct, Your Honor.  I understand the

13   interesting incentive that is going on here but one thing to

14   take a step aside and focus on is what is Leon giving us.  He

15   is giving us information about what happened during the

16   conspiracy.

17             Now, the defendants are saying, no, no, no, he didn't

18   know independently about certain events and he had actually

19   learned about it by gathering information from the

20   co-conspirators, but everything in those MOIs, if you read them

21   carefully, Docket Entry 162, Exhibit 4 and Exhibit 8 are

22   repeated questions about what happened during this conspiracy,

23   what happened when you joined the conspiracy, tell us about the

24   mailers, tell us about interactions with law enforcement.

25             Our questions were always directed to things that

1    happened during the conspiracy.  We never once asked Leon, hey,

2    tell us what happened in February right before you signed the

3    plea agreement, and I think that's important.

4         What they are saying is that Mr. Leon heard things and

5    that refreshed his recollection as far as what happened during

6    the conspiracy that perhaps inaccurately refreshed his

7    recollection as far as what happened.

8         We are not going to call Leon to testify about anything

9    that happened after the return of the indictment, right,

10   because the right to counsel attaches upon the return of the

11   indictment and we are not interested in learning what

12   Mr. Pradel or what Mr. Pisoni told them, told Leon in December

13   of 2015, in January of 2016.  That is not our interest.

14        Our interest is in learning what happened during the

15   conspiracy, and Leon was there so he knows what happened.

16        I understand the point that perhaps there is an

17   incentive, Your Honor, and that there seems to be this gap, but

18   I cannot instruct Mr. Leon until he signs a plea agreement.  He

19   is not a Government agent.  And that is what the Supreme Court

20   has said in -- excuse me, the Second Circuit has said in

21   Bribal, B-R-I-B-A-L, that the signing of an agreement makes

22   somebody a cooperator, and he was not our cooperator until he

23   came in and he signed this agreement.

24        Now, the accusation that somehow undisclosed in these

25   15 pages of MOIs from March 15th and February 11th was some

1    disclosure about a communication that happened between

2    Mr. Pisoni, Pradel, Ramirez and Mr. Leon is just not there.

3    And I understand they can make the accusations but what

4    Mr. Leon was asked and what he answered was what did you learn

5    during the conspiracy, and that's what he answered us.

6          He never attributed anything to any of these defendants

7    during our February, March debriefing about what happened after

8    the return of the indictment.

9          THE COURT:  But why would he?

10         You know, that incentive is important.  It seems

11   reasonable to believe that Mr. Leon would not attribute any of

12   the information that he has given to the Government to those

13   private meetings with his codefendants and their counsel

14   because he wants a -- he wants a 5K motion.  He wants a Rule 35

15   motion, and if he has been instructed not to do something, he

16   knows the value.

17         I got to say, you know, apart from the legality of it,

18   it's pretty distasteful to have a cooperator participating in

19   private discussions between codefendants or former codefendants

20   and their counsel.  That's why the Government typically will

21   delay returning an indictment until they have gotten a witness

22   to cooperate, because once that indictment is returned,

23   everything has changed.  And, you know, just from reading the

24   pleadings, I understand that there was some further

25   investigation going, but to allow Mr. Leon to continue to

1      participate in these meetings -- it's really problematic and in

2      a way I'm not really sure the Government understands.

3              MR. DAVIDSON:  If I may address the two interrelated

4      points, Your Honor.

5              First as to the incentive, I understand what you're

6      saying but every defendant always has an incentive to

7      cooperate.  It's part of the Rule 35, 5K of the guidelines.

8      There is always an incentive.

9              Right after the return of this indictment I met

10     individually with all four defendants and their attorney, their

11     first attorney, Mr. Fallgatter, and I explained there is a

12     possibility for each one of you to cooperate against each

13     other.  That was way back in, approximately, May of 2015.

14             Now, the offer for each one to cooperate was extended.

15     Each one knew that the other one might potentially cooperate.

16             Now to suggest that somehow each one of them had an

17     incentive to go out and seek out as much evidence at my

18     direction, at the Government's direction, the law doesn't

19     support that inference.  Every defendant does have an incentive

20     to gather information but the question that the law poses is

21     did they do so at the Government's instruction, and until the

22     person becomes a Government agent and signs up with the

23     Government, the Government has no control over that person, and

24     that's the key distinction.

25             Any private citizen can do as they choose.  Once they

1    have an agreement with the Government, they are bound to do,

2    consistent with the employee, what the Government asked them

3    to.

4         So the idea that Mr. Leon on his own decided let me

5    gather information, that could have been Mr. Ramirez.  That

6    could have been Mr. Pisoni.  That could have been Mr. Pradel.

7    Any one of those defendants could have been out there on their

8    own trying to gather information to come forward and cooperate,

9    and there is nothing from the Government's perspective that the

10   Government can do or to discourage it because they are

11   defendants in our case.  We cannot contact them except through

12   counsel, and Mr. Leon on his own gathering information was not

13   the Government's doing.

14        THE COURT:  But what the Government could have done is

15   say, Mr. Leon, you are now cooperating, you cannot participate

16   in these meetings any further and be done with it.  Because

17   what you're asking me to do is on one hand say that it's okay

18   to let Mr. Leon participate in these meetings with the

19   codefendants and counsel, yet shield the Government from

20   providing notes.

21        I mean, I don't see how you can do that without having

22   some greater level of transparency.

23        MR. DAVIDSON:  I understand that, Your Honor.  The

24   concern that the District Court in Nelson identified was

25   similar to what you're saying that if there is, in fact, Brady

1    or material that is favorable, then those rough notes should be

2    disclosed to the defendants.  We have never argued that they

3    shouldn't be disclosed if there is anything Brady there.

4           The issue that I see in terms of the timeline is how

5    could Mr. Leon have disclosed anything about these meetings in

6    February and March when the meetings that they're complaining

7    about happened in April.  So I think there is a fundamental

8    defect in their analysis that Leon communicated to the

9    Government in February and March information that happened in

10   April.

11          That, I think, is the problem with demanding the

12   February/March notes when it's impossible that it disclosed any

13   of the private meetings.

14          But you raised a separate issue, Your Honor, which is

15   why did the Government let Mr. Leon go into these meetings, and

16   if I could provide a little bit of context about the dilemma

17   that we were facing, Leon told us, what do I do if they call

18   me.  You will see through the stipulation, through the agent's

19   testimony or Mr. Leon or wherever it comes out that the

20   instruction was consistent, if they call you, you can pick up

21   the phone and you can respond.  You don't have to just hang up

22   with them, but don't disclose with us what you are discussing.

23          So Leon understood that, that we do not want to know

24   the nature of the conversations.  So if Leon says, hey, they

25   invited me to a meeting, what do I do, we don't want to know,

1    is it a lawyer meeting, an expert meeting, is it a handwriting

2    meeting, is it a forensic meeting, is it a financial analyst

3    meeting because by disclosing the nature of the meeting

4    Mr. Leon has given us the information about the defense

5    strategy or who they're interviewing, etcetera.

6            So Leon took -- I think took to heart our instruction

7    do not disclose anything to us.

8            THE COURT:  Well, why would he go -- first of all, I

9    know you weren't participating in those meetings but defense

10   counsel is saying Mr. Leon went to those meetings and he just

11   didn't sit there.  He affirmatively asked for information.  Do

12   you dispute that?

13           MR. DAVIDSON:  I am in a box here, Your Honor, because

14   we have never asked Leon or his counsel what happened at the

15   meetings by design.  Now, they are proffering that they will

16   show that Mr. Leon asked questions and the like but we do not

17   know what happened at the April meeting because we never asked

18   about what happened at the April meeting.  We never asked Leon

19   who are you meeting, what are you meeting about.

20           I think you would have the opposite accusation against

21   the Government if, in fact, we asked Leon, hey, what are they

22   meeting about and he said, oh, it's a lawyer meeting about

23   strategy.  Then the Government would have obtained the very

24   information that they're objecting about.

25           So that's the catch 22.  If we ask Leon what are you

```
 1   meeting about, then he would have to disclose.  And if he
 2   doesn't tell us what they are meeting about, then Leon goes to
 3   a meeting and it looks like the Government is encouraging him
 4   to go to a meeting.  So I think the design that we came up with
 5   at the time was, discourage any communication from Leon about
 6   what the defendants are doing, you know, just meeting general.
 7   And that created, I think, this disconnect about that he went
 8   to a lawyer's meeting versus an expert on handwriting or an
 9   expert on financial analysis or a meeting about suspicious
10   activity reports or a meeting with Japanese translator.
11           If he started to disclose the content of that meeting,
12   we would be in the equally awkward position of now knowing
13   what's going on with the defense camp.
14           THE COURT:  Assuming everything that you are telling me
15   is correct and that the Government gave him very explicit
16   directions as far as what he could and could not do, you are
17   still left with the Government relying on what Mr. Leon told
18   you that he did or did not do.  Right?
19           MR. DAVIDSON:  Correct, Your Honor.  But the
20   instructions that -- yes, but that is corroborated by a few
21   facts.  One is what is in that memorandum of interview, which
22   showed we did not ask and Leon did not provide us discussions
23   about what happened after the return of the indictment.  There
24   is nothing in the MOIs to discuss, well, Pradel told me after
25   the indictment something or Pisoni and I discussed two months
```

1   ago the following facts.

2         Leon's MOIs all talk about things that happened during

3   the conspiracy, how he got recruited, how he learned about

4   interactions with law enforcement, what did he do, what did

5   other people do during the conspiracy.

6         THE COURT:  Presumably, you would have gotten that

7   information in those first couple of meetings.  Right?

8         MR. DAVIDSON:  That's right.

9         THE COURT:  So there were subsequent meetings with

10  Mr. Leon where he gave information to the Government.  Correct?

11        MR. DAVIDSON:  Those were only related to the

12  accusations that Mr. Leon disclosed other things.  That was --

13  those meetings were in preparation for this motion where we

14  asked Mr. Leon, hey -- for example, Mr. Nurik in his motion

15  said the Government only learned about Mr. Lustigman.  So we

16  confronted Mr. Leon and said, "When did you learn about

17  Mr. Lustigman?"

18        And he told us, "I learned about Sheldon Lustigman

19  during the conspiracy."

20        We said, "This motion mentions Andrew Lustigman."

21        Leon said, "I did not know about Andrew Lustigman

22  during the conspiracy.  I knew about Andrew Lustigman only from

23  conversations with the defense counsel and that's why I didn't

24  tell you."

25        That's actually corroboration that we did not know

27

1  about Andrew Lustigman because Mr. Leon didn't tell us anything

2  that happened during those meetings with defense counsel.  So

3  that's one thing.

4          Then we asked him just to make sure that he complied

5  with our instructions and the like.  That's what the second --

6  the last two meetings with Mr. Leon were about.

7          You have almost a time capsule because we know what

8  Mr. Leon knew before the joint defense agreements because those

9  meetings happened February and March.  The meetings that they

10  are complaining about happened in April and late March.  So we

11  know what Leon knew before those meetings because that's

12  captured in the MOIs, and we know what happened -- well, we

13  actually -- the Government doesn't know what happened after

14  those meetings because we never asked about what happened in

15  April by design.  We don't want to know what they were

16  discussing.

17          The other thing that's of import, Your Honor, is that

18  when we met with Mr. Leon, he mentioned this timeline.  He

19  said, "Do you want to see the timeline?"

20          We said, "No."

21          He mentioned, "I have text messages with the

22  defendants.  Do you want to see them?"

23          We said, "No."

24          This structure that we created in place was designed

25  for the Government not to learn anything that happened after

1    the return of the indictment.  So it's consistent with that

2    pattern of do not give us the text messages, do not give us

3    your chart with Mr. Pradel, do not tell us about Andrew

4    Lustigman, which he didn't, do not disclose anything that is

5    consistent with what Leon was doing.

6            THE COURT:  How do we not still have a problem with

7    Mr. Leon's trial testimony because his trial testimony would be

8    informed by this information that he gained at the meetings.

9    Right?

10           MR. DAVIDSON:  I think that there are two separate

11   questions, Your Honor.  One is the Government misconduct

12   accusation regarding dismissal of the indictment, did the

13   Government do anything wrong.  We submit we haven't done

14   anything wrong.  It's a unique circumstance and we're balancing

15   the interest of the Government and pursuing its investigation

16   into the fifth target with the interest of these defendants and

17   keeping their conversations private.

18           I think you raise an interesting point, which is, what

19   did Leon know during the conspiracy and what did he learn

20   during this joint defense agreement.

21           There are two issues I think that come up with the

22   joint defense agreement.  Number one is, did it exist, how long

23   was the joint defense agreement because there is some evidence

24   it was severed in December of 2015 and January of 2016, but let

25   us assume for a minute Mr. Leon was informed about what

1    happened during the conspiracy, refreshed his recollection by

2    talking to Mr. Pradel, Mr. Pisoni and Mr. Ramirez.

3         At a minimum, Your Honor, Mr. Leon knew what was in the

4    factual proffer in his plea agreement where he comes forward

5    and he says, I plead guilty.  I knew what I did was wrong

6    because that was generated, by the way, from the Government.  I

7    drafted the factual proffer and submitted it to him on

8    February 17th, 2016.

9         There were no factual communications between the

10   Government or Mr. Leon prior to February 17th, 2016.  So if you

11   want the purest time capsule, the factual proffer in the plea

12   agreement is something that Leon can take the stand and swear

13   to that he conspired with these people.  It is, you know, pure

14   as gold and has not been tainted by anything disclosed by

15   Mr. Leon as part of these joint defense agreements because I

16   was not party to any of those meetings.

17        But also what happened in February when he comes

18   forward and gives us the information, Leon is going to say what

19   he knew during the conspiracy.  He knows certain things from

20   being there.

21        Now, the defendants can say, well, we talked about it

22   during the joint defense meeting, but if Leon actually

23   remembers it, that is his testimony.  If he was there, he could

24   testify about things he saw, things he did, meetings that he

25   participated in during the conspiracy.  And to suggest that

1    somehow by signing a joint defense agreement a defendant could

2    knock out the testimony of his conspirator, talk about

3    incentives, Your Honor.  If I am engaging in a conspiracy right

4    now, I will have every single member of the conspiracy sign a

5    joint defense agreement and if one of those people were to

6    become a Government informant, I will say they can't testify.

7    They will say why not.  I will say because they have a joint

8    defense agreement and maybe they learned what they are about to

9    testify about through the joint defense agreement.  That is the

10   most perverse incentive, Your Honor.

11          I understand that Mr. Leon did communicate with the

12   defendants before he became a Government cooperator on

13   February 17th, 2016, but the joint defense agreement cannot

14   contractually obligate Mr. Leon not to testify, and if he wants

15   to take the stand and say, I knew this during the conspiracy,

16   they are free to cross-examine him and say, well, no, you

17   learned about it later.  You lied and you did your own

18   investigation and it's really hearsay instead of your own

19   personal recollection.  They can impeach him, but we are going

20   to be asking Leon about things he did, meetings he had with

21   defendants and the like.

22          By the way, those facts should be consistent with

23   what's in the factual proffer, which was, of course, untainted

24   by any communications that they have had.

25          THE COURT:  I've got to tell you, I am, really, less

1    concerned about the joint defense agreement and its import than

2    the defendants are, but I have to be concerned about the

3    integrity of these proceedings and any subsequent trial.

4         You know, the somewhat bright line that has been

5    employed for almost forever is, you know, once there is an

6    indictment and everyone lawyers up, it stops.  You don't get

7    involved with that at all and that's not what has happened

8    here.

9         And I am not suggesting any wrongdoing on your part,

10   but your office in particular with what happened with Judge

11   Gold, I am just absolutely shocked that we are even discussing

12   this.

13        MR. DAVIDSON:  Well, I think there are two separate

14   issues, Your Honor.  You are correct --

15        THE COURT:  They are different but it's still way too

16   close for comfort and I don't understand it.

17        MR. DAVIDSON:  I think there are two straight issues.

18   Number one is by design we are -- there is no evidence that

19   Mr. Leon has communicated anything that has happened at any of

20   these phone calls or meetings with defense counsel.  That

21   distinguishes the Shaygan case beyond leaps and bounds because

22   in that case there was transfer of what happened during the

23   communications.

24        THE COURT:  But how do we know that?  How do we know

25   that?

1          You know, anything that Mr. Leon says he recalls or any

2     clarification that he gives to anything other than his initial

3     statement, which even that, there are some issues, how would

4     one ever know whether or not -- other than Mr. Leon, whether or

5     not it was informed by what he learned in those subsequent

6     meetings?

7          MR. DAVIDSON:  Well, I mean, Your Honor, if we showed

8     Mr. Leon a document that was obtained by subpoena from a third

9     party and he says, oh, now I remember this, e-mail

10    communications, in this it particular case the Canadian-seized

11    e-mails, so that is memorialized communications between

12    Mr. Leon and other codefendants.  If we show him an e-mail and

13    we say, what was going on in this e-mail, he would have an

14    independent recollection refreshed from the Canadian e-mails

15    and he could say I know exactly what was going on here.

16         So we can rely on Mr. Leon if there is independent

17    corroboration that it is, in fact, his e-mails.

18         Your Honor, I understand what your point is about the

19    Sixth Amendment that once the right to counsel attaches the

20    Government does not inquire into anything that is going on with

21    the defendants.

22         There is this issue about what would happen and what my

23    concern is that any ruling would suggest the Government can't

24    do this, a jailhouse informant.  The defendants here have the

25    right to counsel and we did not send anyone in to ask

```
 1    questions, but if the defendant, after receiving rights of

 2    counsel, decides he wants to talk or she wants to talk to a

 3    cell mate, a neighbor, a friend, and that person comes in, yes,

 4    there is a right to counsel, but as long as the Government is

 5    not initiating conversation, sending people in to ask

 6    questions -- I know their accusation is Mr. Leon went in there

 7    to ask questions.  That was not our instructions and we, in

 8    fact, never got what Mr. Leon told us back.  In fact, all of

 9    their meetings happened after the February, March debriefing,

10    so it's impossible that there was communication.

11         THE COURT:  But those were strategy sessions.  Those

12    weren't a conversation in a jail in the yard over breakfast.  I

13    mean, these were strategy sessions specifically designed to

14    discuss how to handle the charges brought by the Government.

15         MR. DAVIDSON:  And that is something that we now know

16    because defense counsel have disclosed to us which meetings

17    Mr. Leon went to, what was discussed at the meetings, but at

18    the time of the Government's action and authorization for

19    Mr. Leon to attend meetings, we complied with what I understood

20    to be the law of this circuit and the Supreme Court, namely, do

21    not ask questions.  If somebody calls you and initiates

22    conversations with you, you can respond, sort of the jailhouse

23    informant situation.

24         We did not put somebody in there to, you know, try and

25    elicit the information.  The instructions were, if you hear
```

```
 1   something, you could tell us.  Do not begin the call.  Do not
 2   go after information and the like.
 3         Now, if their suggestion is that Mr. Leon did not
 4   comply with those instructions, there is no MOI showing that
 5   Mr. Leon disclosed what was going on in any of those legal
 6   meetings.  The legal meetings apparently happened in April.  We
 7   met with Mr. Leon after that but he never disclosed to us what
 8   happened at those meetings, and that was by design.
 9         THE COURT:  Okay.  So the legal meetings -- let's have
10   some clarity -- when did these meetings all take place, the
11   strategy meetings?
12         MR. BOGENSCHUTZ:  On February 2nd, 2016 -- does the
13   Court want to know every one of them because I can go back
14   until August of 2015?
15         THE COURT:  All right.  Well, I would imagine that the
16   more pertinent ones here are any meetings beginning with
17   January 20th.
18         MR. BOGENSCHUTZ:  Just so the record is clear, though,
19   Judge, let me go back to make sure the Court understands this.
20   On August 20th, 2015, a meeting was conducted in Mr. Louis's
21   office with everyone including the defendants.
22         There was another meeting 2/2/16.
23         THE COURT:  I'm sorry, hold on a second.
24         MR. BOGENSCHUTZ:  2/2/16 was a group meeting at my
25   office.  All defendants and all defense attorneys appeared.
```

1   Who appeared by phone on that one?

2         Okay.  There was another meeting on 3/31/16.  It was a

3   conference call where defendants were present but most of the

4   lawyers were on the telephone.

5         On 4/12 there was a meeting with the defendants

6   themselves with a private investigator discussing witnesses and

7   trying to determine whether or not those witnesses would be

8   appropriate for the trial and how we were going to deal with

9   those witnesses because they knew them all.  And it was at that

10  meeting that the documents that are part of the -- I'm sorry,

11  it was at a meeting on February 12th that the documents that

12  are sealed were sent to Mr. Leon at his request.

13        On 4/12 there was another meeting with the lawyers and

14  Mr. Davidson, including the lawyer representing Mr. Leon,

15  Mr. Guerra, for some reason who attended the meeting.  And that

16  meeting was set down for all the lawyers to talk to the

17  Government about potential resolution to that.  Obviously, we

18  didn't even know that Mr. Guerra was involved in any type of

19  negotiations with the Government, much less that they had

20  entered into any agreements.

21        But to be perfectly clear on this, Mr. Guerra did not

22  enter into any meaningful discussions at that meeting.  He sat

23  there, basically.

24        Then, 4/14 there was a meeting between the defendants

25  and Mr. Smerechniak, as I started to say before.  Mr. Leon

 1   attended by telephone, and at that meeting a number of

 2   different documents were provided -- at least the witness

 3   documents were provided to him.

 4        But I think the important thing here is that -- I think

 5   the Court touched on it -- in January when this all started,

 6   these meetings, these discussions between the defendants

 7   themselves at our encouragement were continuing to go on.

 8        If we needed, for instance, a document that related to

 9   one of the corporations, I didn't know where they were, I'd

10   call Mr. Pisoni.  Somebody would call Mr. Pradel, can you find

11   out where this document is and they would go back and forth

12   with each other to find out where the documents were.

13        I think what's important here, Judge, and in response

14   is the actual MOI itself that he is referring to has a section

15   for post indictment.  It actually talks about things that

16   happened post indictment.  This MOI, we believe, because I

17   think what we would be able to prove that a lot of the things

18   that were mentioned in the MOI in the exact words that were

19   given to Mr. Leon by Mr. Pradel's document that is sealed on

20   February 12th suddenly pop up in this MOI, in the exact words,

21   even using words nobody would ever use, using dates that were

22   wrong.

23        THE COURT:  Can you show me what you are talking about,

24   please?

25        MR. BOGENSCHUTZ:  In this?

1           THE COURT:  Yes.

2           MR. BOGENSCHUTZ:  Yes, I can.

3           I can do it by a chart, Judge.

4           THE COURT:  Why don't we start with the MOI?  I just

5    want to see what you are pointing at.

6           MR. BOGENSCHUTZ:  This is the MOI, or at least it was

7    reference the MOI.

8           One of the documents that is currently sealed.

9           THE COURT:  You do realize I can't see that far.

10          MR. BOGENSCHUTZ:  If I could approach, I could point

11   this out.  We did this hopefully so you can see it.

12          THE COURT:  Or if you want to put it on the ELMO, we

13   can exclude the gallery if that's easier also.

14          MR. BOGENSCHUTZ:  Maybe if Mr. Davidson or the other

15   lawyers are aware of this -- if you step up we can do it right

16   here.

17          What we did, and this we are marking it for purposes of

18   the hearing but I will be happy to deliver it to the Court now.

19   What we did is we took the information from one of those

20   documents that was sealed.  That was one of the documents that

21   went to Mr. Leon on February the 12th, 2016, or five days

22   before he actually signed the plea agreement that they have

23   been talking about since January 20th.

24          Some of the things that were in this document -- first

25   of all, there was an interview the document indicates because

1    they were trying to figure out what went on in this case so a

2    timeline was prepared by Mr. Pradel.  Talked about an interview

3    with Mr. Ramirez with the postal inspectors, and he dates it

4    7/2008.  All of a sudden, in the MOI, five days later, they

5    talk about -- Mr. Leon says Ramirez interviewed the postal

6    inspector 7/2008.  In fact, the interview was August of 2009.

7            The Heathrow seizure.  There was a seizure at Heathrow

8    Airport.  When Mr. Pradel sent that document, he got the wrong

9    date.

10           Mr. Leon then talks to the postal inspectors five days

11   later.  He's got the same date, the wrong date.  The right date

12   is 11/2012.

13           There is a New York Daily News article talking about

14   scamming seniors.  In that document that Mr. Pradel sent to

15   Mr. Leon five days before their hearing, before their MOI, he

16   identifies it as having taken place in late 2010.  Mr. Leon

17   tells the Government in the MOI late 2010.  We know it was

18   July 2010 because we have the document.  We have the article.

19           There was an occurrence in Bloomfield, Colorado,

20   Bloomfield, Colorado.  The Government asked them about that in

21   their MOI.  Five days before that Mr. Pradel had sent that

22   document to Mr. Leon misidentifying, misspelling the name.  All

23   of a sudden, five days later, the information goes to the

24   Government misspelling the same name.

25           It's Bloomfield.  It's not Broomfield.  We have

1    documentation that proves that.

2         Then we have another problem with that same document

3    because Mr. Pradel when he sends that document to Mr. Leon five

4    days before this incident where they do the MOI says it was

5    January 2013.  All of a sudden, five days later, that was

6    identified as being January 2013.  It's not.  The actual date

7    was in March 2013.

8         Mr. Hernandez, a Government witness, in that document

9    from Mr. Pradel he is telling everybody Mr. Hernandez was

10   arrested in Vancouver on March -- in March of 2012.  Five days

11   later, Mr. Leon tells the Government he is arrested in

12   Vancouver in March of 2012.

13        In truth in fact, Mr. Hernandez wasn't even sentenced

14   in 2012.  He was sentenced in June of 2011.  Absolutely

15   everything in those five instances exactly as it was told in

16   Mr. Pradel's document.  And it gets worse because I told the

17   Court that there were things that were even in the exact words

18   that the Government was told.  These are all in the MOIs,

19   except for one incident that I will tell the Court about here.

20        The Heathrow seizure was discussed in Mr. Pradel's

21   document.  Mailers shipped from U.S. for reinjection.  That's

22   an interesting word, "reinjection."  That's a word that was

23   made out by Mr. Pradel, no such word.  "Reinjection into

24   international stream held by UK Customs."

25        Five days later Mr. Leon talking to the Government

 1    said, Heathrow seizure held by UK Customs.  This seizure was

 2    the reinjection of bulk mail that was to be placed into the

 3    mail stream in the U.S.  Reinjection into the international

 4    stream held by UK Customs.  Almost precisely the same words,

 5    same mistakes in.

 6         The next one, in 2009, a TV channel ran a story

 7    accusing of scamming seniors.  Robbie Birnbaum, the lawyer.

 8         Again, 2009, five days later, TV channel ran a segment

 9    on scamming seniors, Birnbaum handled.

10         2011, mailbox in Philly dedicated to Canada consumer

11    responses shut down by USPIS, Robbie.  Robbie Birnbaum, the

12    lawyer representing the company.

13         Five days later, 2011 mailbox in Philadelphia shut

14    down, Birnbaum handled.

15         It almost looked like -- although I don't think this

16    happens.  I hope it doesn't look like it.  It almost looks like

17    he is sitting there talking to the postal inspector and is

18    telling him basically what he remembers by looking at this

19    document with the Government.

20         So we have 2012, July, caging company office in

21    Vancouver raided by the local PD, charges dropped in late 2014.

22         Five days later, 7/2012, caging company raided in

23    Vancouver, Canada, charges were dropped.

24         The next one, 2013, January, "front end mailing"

25    responses, 1,500 to 2,000 pieces -- the exact numbers -- held

1    by United States Postal Inspector Service in Broomfield.

2    Again, the mistaken spelling for Bloomfield, Colorado.

3         Five days later, January, 2013, 1,500 to 2,000 pieces

4    of mail held by USPIS.  They are being held in Broomfield,

5    again, the wrong spelling, Colorado.

6         January 2013, front end mailing, Broomfield, again

7    misspelled, Birnbaum involved.  That was from the 3/11 MOI, the

8    next MOI.

9         2014, March, group decision was made to stop marketing.

10   3/2014, group decision to stop marketing under Mail Tree,

11   retained Birnbaum for assistance.

12        Then the last one, which is one of the more interesting

13   ones because we don't talk in quarters usually, we talked in

14   dates, as they have all the way through this, dates these

15   things happened.  The Pradel document says 2014 Q4, Quarter 4,

16   got info from third party that grand jury was impanelled.

17        The exact language in the MOI five days later, fourth

18   quarter 2014, grand jury impaneled for the criminal

19   investigation.

20        Now, that's just a smattering of what we have here.

21        This is what has caused us the problems.  We know from

22   looking at this that Mr. Leon, most assuredly, regurgitated to

23   the Government what he got from Mr. Pradel.

24        THE COURT:  I'm sorry, other than, for example, the

25   misspellings or the wrong date, how would one know that this is

 1    not simply information that Mr. Leon had himself as opposed --

 2    and that he didn't have to rely on the information provided by

 3    Mr. Pradel?

 4            MR. NURIK:  May I address that, Your Honor?

 5            THE COURT:  Yes.

 6            MR. NURIK:  Because the evidence will show we had a

 7    hearing, an evidentiary hearing that on January 20th, the exact

 8    date that the negotiations began between the Government and

 9    Mr. Leon's attorney for the purpose of Mr. Leon cooperating and

10    pleading guilty, Mr. Leon solicited this from my client,

11    Mr. Pradel.

12            Mr. Pradel's response was, it's not ready yet.  On the

13    12th of February, five days before Mr. Leon actually sat down

14    knowing, obviously, that he was going to be meeting with the

15    Government because no meeting is set up the very day it

16    happens, Mr. Leon sends an e-mail, which we have, to Mr. Pradel

17    asking for it again, at which point Mr. Pradel says, here it

18    is, and we have the e-mail showing that it was sent to

19    Mr. Leon.

20            So Mr. Leon affirmatively, like Your Honor wisely

21    pointed out earlier, had an incentive to gain information

22    during these joint defense, during these confidential,

23    understood to be confidential communications, asked for the

24    information, got the information and then manages to parrot it

25    almost identically and makes the same mistakes that we can

1    conclusively show are, in fact, mistakes because Mr. Pradel

2    would testify if there were a hearing that he recalled it from

3    memory and it was faulty memory.

4           Curiously, the same exact things come out of Mr. Leon's

5    mouth.

6           What we are attempting to show Your Honor is that

7    Mr. Leon cannot be trusted to have followed the Government's

8    instructions, that Mr. Leon, as the evidence will show, during

9    a hearing affirmatively solicited information, participated in

10   discussions, participated in meetings for the purpose of

11   gaining as much information to feather his nest to gain the

12   maximum amount of cooperation credit.

13          THE COURT:  As you gentlemen heard the Government argue

14   before, the bulk of the -- the Government's position is that

15   the bulk of information was already provided in the first two

16   debriefings in February and March and that the -- I'm

17   paraphrasing but the -- any information gained from the

18   subsequent meetings is immaterial.

19          MR. NURIK:  Putting that argument on focus right now,

20   we had an initial meeting.  The evidence would show at a

21   hearing we had an initial meeting on August 20th of 2015 where

22   there was a joint discussion of trial strategy.  There was

23   subsequent meetings.

24          There was a meeting in February where all --

25   February 2nd, I believe, where all counsel and clients were

1    present either in person or on the phone where there were joint

2    discussions about trial strategy, about facts of the case,

3    about witnesses.

4           There was also a -- there were a number of authorized

5    directed discussions between the four defendants and some one

6    or two at a time that are reflected in messages, group chats

7    that we have evidence of and e-mails where they discussed and

8    talked about strategy.

9           There was a meeting on February 2nd, as I indicated.

10   So there were a number of meetings well before the actual first

11   interview on February 17th, and that's what the evidence would

12   show at a hearing.  And during these meetings there was

13   discussion about trial strategy, discussion about witnesses and

14   there is no way at this point in time to rely on Mr. Leon's

15   assertion to the Government that he was following whatever

16   their advice is.

17          And frankly, Your Honor, their position sounds more

18   like "don't ask, don't tell" than anything else.

19          They knew he was attending meetings.  They gave him

20   permission to attend meetings.  Their position was, well, we

21   are not going to ask you anything and we are going to rely on

22   the fact that you as a cooperator, you are not going to tell us

23   anything.  That's very dangerous in this situation, as the

24   Court has suggested, and we really have no way to protect

25   ourselves in this scenario other than to ask for the relief we

1    have.

2         MR. BOGENSCHUTZ:  And, therefore, we ask as well,

3    Judge, for whatever other rough notes they have that they

4    decided not to put into the MOI so we can review that and see

5    what other information he has provided that the Government has

6    decided not put in the MOI or they may or may not use.  Because

7    as the Court knows, and I know the Government knows we have had

8    discussions about this, how the Government produces its case,

9    how it prepares its case, the witnesses it calls, the witnesses

10   it doesn't call is a product of their mind.  It's a product of

11   how they deal with the specific instances of the case.

12        We have no idea what else this man has told the

13   Government except what we have seen in the four MOIs we have

14   seen, and I don't think we can depend on the agents to put

15   everything on the MOI except what they parse out -- and I am

16   not suggesting that is inappropriate -- except what they parse

17   out and try to determine what is important to relate.

18        A lot of this they have been told, I am guessing,

19   probably didn't make it into the MOI because they didn't

20   recognize or realize at the time where he got the information

21   from, but I think we are going to be in a position to say that

22   this information came from joint defense conferences between

23   the defendants and the lawyers as long as we know what it is.

24   But we don't know what it is because the Government has taken

25   the position we are not entitled to it.

1            There is no prejudice that is going to inure to the

2       Government on this because if, in fact, they believe that some

3       of this information in the MOIs -- I'm sorry, in the rough

4       notes may jeopardize an indictment, may jeopardize a current

5       investigation, we have no problem with them submitting them to

6       the Court so the Court can review it with whatever redactions,

7       a clean copy as well as a redacted copy so the Court can see

8       what they are redacting and can make a determination whether or

9       not we will get a redacted copy or some semblance of a redacted

10      copy that only deals with this case and Mr. Leon as far as

11      these three defendants.

12           That's the least of our problems, I think, but at least

13      give us the opportunity to be able to discover what kind of

14      infection has been put in this case by Mr. Leon's ability given

15      to them by the Government.

16           The Government didn't -- I am not suggesting that they

17      did intentionally do anything improper, but I am saying that

18      they certainly intentionally permitted him to go into what I

19      think should have been a pristine area covered by the Fifth and

20      the Sixth Amendment, and at this point it's pretty limited what

21      we are asking for.  We are only asking for the rough notes.

22           THE COURT:  All right.  The defendants' joint motion

23      for production of all rough notes and interviews as it pertains

24      to Mr. Leon, which was Docket Entry 176, is granted.  The Court

25      finds that the defendants have made a sufficient showing that

 1      there is good cause for that production.

 2            I reviewed the cases cited by the parties and relied in

 3      great part on the same cases, including United States versus

 4      Jordan, Eleventh Circuit case cited at 316 F.3d 1215 in 2003

 5      and United States versus Nelson, cited at 210 WL 4639236, and

 6      United States versus Walker, Seventh Circuit opinion from

 7      272 F.3d 407 from 2001.

 8            I think the distinguishing factor here is that, you

 9      know, those cases involved primarily a simple matter of

10      production under Rule 16 and the Jencks Act where in this case

11      there is an allegation of misconduct, and I think the

12      defendants have made a sufficient showing to compel the

13      production of the rough notes.

14            I will, of course, allow the Government to redact

15      information other than the statements made by Mr. Leon.  So

16      anything showing the agents' impressions or related to any

17      other investigation may be redacted.

18            What I am going to ask -- I will give the Government

19      ten days as a sufficient -- is ten days a sufficient time to

20      provide that?

21            MR. DAVIDSON:  Yes, Your Honor.

22            THE COURT:  I will ask the Government, you can directly

23      provide the redacted copies to defense counsel and the Court

24      but you should also provide the Court with an unredacted copy

25      so I can simultaneously review it.

```
 1          I am assuming before we have any further argument on

 2    the motion to dismiss that you want to review those notes?

 3          MR. BOGENSCHUTZ:  That would be accurate, Judge.

 4          THE COURT:  So we will reschedule the hearing after

 5    those notes have been provided.

 6          Just for the motion, something to think about and I am

 7    not going to rule on the motion to dismiss today but, you know,

 8    I really have to impose the least -- well, a less onerous

 9    sanction than dismissal, if appropriate.

10          Why wouldn't limiting Mr. Leon's testimony in some way

11    be a more appropriate remedy as opposed to a full dismissal?

12          MR. BOGENSCHUTZ:  Judge, it may, but I think that

13    that's going to depend, frankly, on our ability to look at

14    these notes and make a determination on whether or not we think

15    that -- although it's not exactly the same fact pattern but a

16    Kastigar type hearing might be appropriate.

17          I have a hard time understanding how the Court might be

18    able to limit his testimony if we are not sure what the

19    impressions of his mind are and what he is really relying on

20    for his testimony as opposed to what he actually observed pre

21    indictment or actually pre November of 2014.

22          THE COURT:  Well, presumably you have his recorded

23    statements to law enforcement on those first two debriefings

24    and perhaps simply subjecting him to cross examination

25    regarding those other issues and how he got that information
```

```
1    might be a reasonable alternative to dismissal but I am not
2    making that decision today.
3            MR. NURIK:  If I can just address that, I think there
4    is a distinction to -- although I still believe and I think
5    after we have a full evidentiary hearing the Court will see the
6    utility of dismissing this case but if the Court were looking
7    at a less restrictive alternative for the sanction against the
8    Government, I don't see how anything but excluding Mr. Leon as
9    a witness could work simply because even if, as the Government
10   suggested, he testified briefly to what his proffer was that
11   was suggested to him by the Government, we still have
12   cross-examination.  And during cross-examination how will we
13   know the facts that he is answering us back with during
14   cross-examination didn't come from joint defense meetings or
15   confidential communications between the defendants.  There is
16   just no way to know, especially with the showing I believe we
17   can make that he affirmatively solicited information in order
18   to provide it to the Government.
19           So I don't know how you can parse out what he knew from
20   his own knowledge during the conspiracy, the alleged conspiracy
21   and what he then later learned, what was grafted upon that by
22   communications with the defendants and defendants' counsel.  I
23   don't know how anybody could possibly do that.
24           THE COURT:  Perhaps you can start with the chart behind
25   Mr. Bogenschutz.
```

1          All right.  As far as the unopposed joint motion to

2    continue, how much time do you think you need?

3          MR. DAVIDSON:  Your Honor, the wrinkles that we are

4    encountering are travel in September.  I have a trial before

5    Judge Williams beginning October 17th.

6          Mr. Nurik indicated that he has a trial also beginning

7    in October which begins to push us back into the November

8    timeframe with the risk, of course, of Thanksgiving and

9    afterwards Christmas so that's the ballpark area we were

10   proposing.

11         THE COURT:  I'm sorry, you are proposing what,

12   November?

13         MR. DAVIDSON:  The one idea I have is November 14th,

14   with the caveat that there is a risk that if the trial I have

15   with Judge Williams continues into a fifth week, which I don't

16   anticipate, then we might have to push it back slightly.

17         MR. BOGENSCHUTZ:  Judge, may I address that?

18         THE COURT:  First, I don't know if that's available.  I

19   have some other matters set.

20         There is also the two-week period beginning

21   November 28th.  That's a bit old.

22         MR. BOGENSCHUTZ:  Yes, Judge.  Respectfully, I don't

23   think this case is going to be completed in two weeks.  I can't

24   imagine.

25         THE COURT:  We will extend it beyond that but as far as

```
 1    a start date --
 2          MR. BOGENSCHUTZ:  I think were it not for the issue --
 3    I don't know how much this complicates it, an additional
 4    hearing on this but I think that -- I believe that any
 5    subsequent hearing on these matters could possibly take place
 6    in one day.  I think it's a day hearing.  I don't think it's
 7    any more than that but we have just received and part of the
 8    motion to continue that we tried to file, we just received a
 9    hard drive that the Government just got from a lady named --
10    actually, from John Leon that they found out came from a lady
11    named Dawn Coletta, which she gave to the Government at some
12    point.  We are not sure when at this point.  The Government
13    hasn't advised us of that but at some point -- they have
14    provided us with a hard drive that has thousands upon thousands
15    of documents.  We still have not been able to open that hard
16    drive.  It's encrypted somehow.  It's actually working against
17    us to open it up.  I don't know -- and that was the biggest
18    problem that I think, besides this motion, that we had for this
19    hearing.
20          I don't know how that's going to impact on the
21    November, the two-week calendar in November.  I am a little
22    concerned -- Mr. Nurik and I had this discussion this morning.
23    I am a little concerned on a jury selection with a two or
24    three-week trial with jurors that are looking at Christmas and
25    maybe have made plans for Christmas and maybe wouldn't be able
```

1    to serve.

2          I am not looking forward to putting this case on a

3    long-term docket, believe me, because we have been at it long

4    enough but my guess is that probably sometime after the first

5    of the year is probably the time we ought to set it.

6          THE COURT:  Well, I mean, I think after Thanksgiving

7    and before Christmas, the three-week period then is a pretty

8    good time.  If you are telling me that's not realistic because

9    of discovery, that's a different matter but you have to tell

10   me.  I haven't seen the discovery.  I don't know.

11         MR. BOGENSCHUTZ:  Judge, I honestly don't know.  All I

12   know is that we tried to open it up and it's impossible.  We

13   are trying to get it open and there are just -- it's probably

14   going to take days just to download it is my guess.

15         THE COURT:  Well, Mr. Davidson will know best.

16         MR. DAVIDSON:  I tried to confer with the IRS agent to

17   get in touch with the computer people to assist them.  I

18   understand that they have had several phone calls walking them

19   through how to encrypt everything.  My goal is to get them the

20   computer in as easy a format for them to use as possible.

21         THE COURT:  How voluminous is the discovery?

22         MR. DAVIDSON:  I know it's a computer.  I think it's --

23   I heard two terabytes but the agents went through it with

24   Mr. Leon.  We identified at least 200 pages that are of

25   interest to us but I understand there might be some documents

1    that are of interest to them.

2          THE COURT:  Okay.  Why don't we -- I will set this for

3    trial for the period beginning November 28th.  We will have the

4    hearing on the motion to dismiss before then and if by then,

5    presumably, you will know what you are dealing with and then if

6    we need to revisit it, we will revisit it.

7          So we will set this for trial -- you think this is a

8    three-week trial?

9          MR. BOGENSCHUTZ:  I think it is.  The Government

10   probably has two.

11         MR. DAVIDSON:  I think that's fair, Your Honor, yes.

12         THE COURT:  All right.  Set this for trial on Monday,

13   November 28th.  Calendar call is at 9:30 on the 23rd.  The

14   Court is granting the unopposed joint motion for continuance

15   with the finding that all the time between the filing of the

16   motion and the start of trial is excluded under the Speedy

17   Trial Act based on the Court's findings that the ends of

18   justice outweigh the interest of the public and the defendants

19   to a speedy trial for the reasons discussed today and outlined

20   in the motion, which is Docket Entry 184.

21         I think perhaps after you receive the notes the parties

22   can jointly call Mr. Creary, my CRD, to schedule a date for the

23   hearing as opposed to doing it now.

24         MR. BOGENSCHUTZ:  Yes, sir.

25         MR. NURIK:  Your Honor, would the Court allow me to

1    attend the calendar call on the 23rd telephonically?

2         THE COURT:  Yes.  Anything else today on behalf of the

3    Government?

4         MR. DAVIDSON:  No, Your Honor, thank you.

5         THE COURT:  For the defendants?

6         MR. BOGENSCHUTZ:  No, Your Honor.

7         THE COURT:  All right.  Then we will be in recess.

8         MS. LANIADO:  Thank you, Your Honor.

9         COURT SECURITY OFFICER:  All rise.

10         (The proceedings were concluded at 12:26 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I hereby certify that the foregoing is an

 4    accurate transcription of the proceedings in the

 5    above-entitled matter.

 6

 7

 8    August 17, 2016        /s/Patricia Diaz_____
      DATE                   PATRICIA DIAZ, FCRR,  RPR, FPR
 9                           Official Court Reporter
                             United States District Court
10                           400 North Miami Avenue, 11th Floor
                             Miami, Florida 33128
11                           (305) 523-5178

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```